2019 IL App (3d) 180213

Opinion filed February 8, 2019

_____

IN THE

APPELLATE COURT OF ILLINOIS

THIRD DISTRICT

2019

| | | |
|---|---|---|
| CREST HILL LAND DEVELOPMENT, LLC, an Illinois Limited Liability Company, | ) ) ) | Appeal from the Circuit Court of the 12th Judicial Circuit, Will County, Illinois. |
| Plaintiff-Appellant, | ) ) | |
| v. | ) ) | |
| JOHN C. CONRAD, | ) ) | |
| Defendant-Appellee. | ) ) | |
| _____ | ) ) | |
| JOHN C. CONRAD, | ) ) | |
| Counterplaintiff and Third-Party Plaintiff-Appellee, | ) ) ) | |
| v. | ) ) | Appeal No. 3-18-0213 Circuit No. 14-CH-1759 |
| CREST HILL LAND DEVELOPMENT, LLC, an Illinois Limited Liability Company, | ) ) ) ) | |
| Counterdefendant-Appellant, | ) ) | |
| and | ) ) | |
| SHALBRY, LLC, an Illinois Limited Liability Company; DIVISION-GAYLORD, LLC, an Illinois Limited Liability Company; RICH PRODUCTS CORPORATION, a Delaware | ) ) ) ) ) ) | |

Corporation; CABOT IV-IL1B04, LLC, a          )
Delaware Limited Liability Company; and         )
BMO HARRIS BANK, NA, a National                 )
Banking Association,                            )          The Honorable
                                                )          John C. Anderson,
            Third-Party Defendants.             )          Judge, presiding.

---

JUSTICE CARTER delivered the judgment of the court, with opinion.
Justices Holdridge and Lytton concurred in the judgment and opinion.

---

**OPINION**

¶ 1        Plaintiff, Crest Hill Land Development, LLC (CHLD), filed suit against defendant, John

C. Conrad, to quiet title and for slander of title in relation to an industrial park that CHLD had

developed. Conrad counterclaimed for money that he was allegedly owed pursuant to a novation

and joined as third-party defendants certain entities that had purchased a portion of the industrial

park property from CHLD or that had otherwise acquired an interest in the property after Conrad

had recorded the novation. After a bench trial, the trial court ruled in Conrad's favor on all

claims. The trial court awarded Conrad the full amount of his money due claim plus interest and

denied CHLD's claim for equitable setoff.[1] CHLD filed a posttrial motion, which the trial court

subsequently denied. CHLD appeals, arguing that the trial court erred in (1) ruling in Conrad's

favor on his claim for money due, (2) ruling against CHLD on its claims for quiet of title and

slander of title, and (3) denying CHLD's claim for equitable setoff.[2] We affirm the trial court's

judgment.

---

[1] The Inland Empire Service Corporation (Indeck) subsequently acquired Conrad's rights under the judgment and was substituted in the trial court for Conrad as counterplaintiff and third-party plaintiff but not as defendant. For simplicity purposes, we will refer to Conrad as the acting party in all three capacities in this appeal.

[2] In its brief on appeal, CHLD also raised a challenge as to the amount of interest that the trial court awarded to Conrad. At oral argument, however, CHLD represented to this court that the issue as to interest had been resolved. Therefore, we have not addressed that issue in this appeal.

2

John Conrad and Peter Konopka knew each other and had prior business dealings. At some point before or during July 1999, Conrad and Konopka decided to purchase the subject property—a 168 acre parcel in Crest Hill, Will County, Illinois—from Elgin, Joliet & Eastern Railway Company (EJ&E) to develop an industrial park at that location. For that purpose, Conrad and Konopka (through Konopka's corporation) entered into a purchase agreement with EJ&E. The final purchase price was $4.2 million.[3] In December 1999, Conrad established CHLD by filing articles of organization for the company with the Secretary of State.[4] In the articles of organization, Conrad was listed as the manager of CHLD.

To help finance the purchase of the property, an investor, Roger Duba, was brought into the transaction. In April 2000, as part of the initial negotiations, Konopka, Duba, and a real estate broker who had brought the two together, signed a letter of intent. The letter of intent indicated that a new limited liability company would be formed for the project, that Duba would invest $2.5 million in the project, that Duba and Konopka would each own a 50% interest in the new limited liability company, and that Conrad's interest in the project would be bought-out as an expense of the project. The letter of intent, however, did not set a specific price or the specific terms of Conrad's buyout. Rather, the price of the buyout was specified only in terms of the value of a possible future transaction or a discounted cash price.

The purchase from EJ&E was closed in July 2000. Instead of forming a new limited liability company for the project, Konopka and Duba had CHLD take title to the industrial park

---

[3] The amounts listed in this opinion have been rounded off for the convenience of the reader.

[4] CHLD was originally named Crest Hill Development, LLC. The name of the company was later changed to Crest Hill Land Development, LLC.

property. To pay the purchase price of the property and the closing costs, CHLD used the initial investment from Duba and also obtained a bank loan for $2.5 million. The bank loan was secured by a mortgage on the industrial park property. In addition, Konopka and Duba each signed personal guaranties of the loan.

¶ 6    The initial part of the closing took place on July 12, 2000. On that date, the parties signed the bulk of the documents necessary to purchase the property from EJ&E, including Conrad's and Konopka's assignments of the purchase agreement, and those documents were placed into a closing escrow. For the documents that needed to be signed by CHLD, Konopka signed those documents as the managing member. Many of those same documents also had Duba's signature on them, as the other member of CHLD, at or near Konopka's signature. Conrad was not listed as a member or manager of CHLD in any of those documents.

¶ 7    On the same date as the initial part of the closing, July 12, 2000, Conrad and Konopka signed a written agreement in their individual capacities wherein it was provided that Conrad would receive $350,000 to buyout his interest in the industrial park property. Conrad was to be paid $142,000 up front at the closing of the purchase from EJ&E and was to be paid the remaining $208,000 at a later date by Konopka out of Konopka's share of the distributions from CHLD's sales of the industrial park lots. The agreement also provided that (1) Conrad and Konopka would keep the agreement confidential, (2) Conrad would not receive the deferred payment until after CHLD had paid off both the bank loan and Duba's initial investment in the development, (3) Conrad would not record the agreement against the industrial park property, and (4) an excavation company with which Conrad was affiliated, Plaza Excavating, would get a "last look" bid on all excavation work for the property. Duba did not know about the personal agreement between Conrad and Konopka and would not have agreed to it.

4

¶ 8        Also on July 12, 2000, Konopka and Duba signed the operating agreement for CHLD. The operating agreement listed Konopka and Duba as the only two members of CHLD and listed Konopka as the managing member. Of relevance to this appeal, paragraph 5.4 of the operating agreement provided that Conrad would be paid $142,000 for the assignment of his interest in the industrial park property and made no mention of any additional payment to be made to Conrad for his interest. Other relevant provisions of the operating agreement provided that (1) the prior written approval of all members was required for all major decisions, including any expense over $500, other than ordinary expenses, such as taxes and insurance (paragraph 9.10) and (2) each member of CHLD was allowed to transact business with the company as long as such business was done at "arm's length" and on commercially reasonable terms and the member did not use his standing to obtain favorable treatment for himself or others (paragraphs 5.1 and 9.9).

¶ 9        The following day, on July 13, 2000, the deeds to the subject property were signed by a representative of EJ&E in Pennsylvania. The deeds were then apparently forwarded to the closing agent in Illinois so that the closing of the purchase of the property could be completed.

¶ 10        Two days after their initial personal agreement, on July 14, 2000, Conrad individually and Konopka as the manager of CHLD entered into a second written agreement, the alleged novation in this case. The novation provided that CHLD—and not Konopka individually—would pay the remaining $208,000 owed to Conrad. The payment was to be made by CHLD when money was available or when less than 60 acres of the industrial park property remained, whichever occurred first. The provision that Conrad had to wait to receive payment until after the bank loan and Duba's initial investment were paid off was eliminated, as was the provision giving Conrad's excavation company a last look bid on all excavation work. In addition, Conrad was given the right to record the novation against the remaining industrial park property after the

5

amount of land available reached 60 acres or less, if Konopka/CHLD did not record the novation. As with the prior agreement between Konopka and Conrad, Duba did not know about the novation and would not have agreed to it.

¶ 11   On July 17, 2000, the remainder of the closing was completed, and Conrad was issued a check for $142,000. Although some of the closing took place on July 17, 2000, EJ&E had previously agreed to consider July 12, 2000, to be the closing date so that the purchase price of the property would not be affected.

¶ 12   In January 2001, Conrad sent Konopka a letter that referred to their agreement of "July 12, 2000," and the $208,000 he was owed.

¶ 13   In November 2002, CHLD filed an amendment with the Secretary of State, indicating that Conrad was no longer a manager of CHLD.

¶ 14   In October 2003, Conrad sent another letter to Konopka. In the letter, Conrad again referred to his and Konopka's "7/12/2000," agreement and the money he was owed.

¶ 15   In December 2003, CHLD sold a portion of the industrial park property to Indeck for $4.4 million. CHLD paid Conrad a referral fee of $214,000 for facilitating the sale. Although Conrad had previously been a licensed real estate agent, he was no longer licensed at that time. Over $3 million of the sale proceeds were used by CHLD to pay down its bank loan, and $500,000 of the sale proceeds was paid to Duba individually.

¶ 16   At or near the end of October 2005, the amount of property left in the industrial park dropped below 60 acres, triggering the recording provision of the novation. CHLD/Konopka did not record the novation at that time or at any time thereafter.

6

¶ 17      In December 2007, Conrad sent Konopka an email and pointed out that, pursuant to the agreement between him and Konopka, Plaza Excavating was supposed to do the excavation work on the project.

¶ 18      In March 2010, CHLD defaulted on its bank loan. The default triggered the application of an 18% default interest rate. In May 2011, Division-Gaylord, LLC, a limited liability company managed by Duba's son, purchased the defaulted bank loan (the defaulted note and mortgage). Division-Gaylord had been created by Duba's trust and had been funded by Duba. In July 2011, Division-Gaylord filed a mortgage foreclosure action against CHLD, based upon the defaulted bank loan.

¶ 19      In December 2011, Konopka sent an email to Conrad, suggesting that they rememorialize the "Shefsky letter" so that Konopka could add the updated paperwork to the bills owing from CHLD and try to get Conrad paid the amount he was allegedly owed. The Shefsky letter was a letter from Conrad's attorney that had allegedly served as the framework for the July 14, 2000, novation. In a response email, Conrad corrected Konopka as to the amount that he was owed and stated that he could just record the Shefsky letter against the property. In a further response sent later that month, Conrad asked Konopka how Konopka wanted Conrad to memorialize the Shefsky letter. Konopka did not respond to that email. By the date of the December 2011 emails, Conrad's excavation company no longer existed and had sold off all of its equipment.

¶ 20      In January 2013, Conrad recorded the novation. On the fourth page of the recorded document, Conrad listed the parcel index numbers of the remaining industrial park parcels to which the novation applied.

¶ 21      In May 2013, CHLD sold a portion of the industrial park property to Shalbry, LLC, for $1.1 million. BMO Harris Bank, N.A., was Shalbry's lender for the transaction.

¶ 22    In December 2013, CHLD filed the instant quiet title and slander of title lawsuit against Conrad in Cook County. CHLD's legal fees and costs of suit were paid for by Division-Gaylord as an advance to CHLD. The suit was later transferred to Will County on Conrad's motion for change of venue.

¶ 23    In February 2014, CHLD (with Konopka and Duba acting as comanagers pursuant to a court order) entered into a forbearance agreement with Division-Gaylord.[5] The forbearance agreement provided CHLD with relief from the mortgage payments and from the default interest rate during the forbearance period (18 months). At or near that same time, CHLD transferred a portion of the industrial park property to Division-Gaylord in lieu of a foreclosure. The following month, Division-Gaylord voluntarily dismissed its mortgage foreclosure action against CHLD. In May 2014, Duba recorded a lien against the industrial park property for money he was allegedly owed pursuant to a settlement agreement between CHLD, Duba, Konopka, and Division-Gaylord. The amount of Duba's lien was between $3.4 million and $7.1 million (the amount varied depending upon whether certain settlement amounts were paid to Duba). That same day, Division-Gaylord recorded its deed in lieu of foreclosure.

¶ 24    In January 2015, CHLD sold a portion of the industrial park property to Rich Products Corporation for $ 2.9 million. As part of the transaction, $475,000 was held back and kept in escrow by the title company to pay off Conrad's alleged interest in the development, if necessary.

---

[5] It is not quite clear from the record whether the forbearance agreement was meant to start on February 25, 2013, or February 25, 2014. The agreement lists an effective date of February 25, 2013. However, the signatures are dated as "AGREED TO" February 25, 2014, and the agreement itself references a court order that was entered in December 2013, after the February 2013 effective date listed in the agreement would have already occurred.

¶ 25　　　　In September 2015, CHLD sold a portion of the industrial park property to Cabot IV-IL1B04, LLC, commonly known as Ridgeline, for $4 million. As part of that transaction, $3.5 million was held back and kept in escrow by the title company at the direction of CHLD.

¶ 26　　　　In December 2015, the trial court granted CHLD permission to conduct destructive ink testing on the novation. Conrad later filed a motion to compel disclosure of the report of the ink testing results. CHLD objected to the motion, claiming that the results were privileged attorney work product. Following a hearing, the trial court denied Conrad's motion to compel.

¶ 27　　　　In January 2016, Conrad filed an amended counterclaim to recover the $208,000 he was allegedly due. In addition to naming CHLD as a counterdefendant in the suit, Conrad named as third-party defendants the entities that had purchased a portion of the industrial park property or that had otherwise acquired an interest in the property after Conrad had recorded the novation.

¶ 28　　　　In August 2016, after the forbearance period had expired or was due to expire, Division-Gaylord filed a second foreclosure action against CHLD, based upon the defaulted bank loan. Despite the recorded novation and the pendency of the instant case, Division-Gaylord did not name Conrad as a defendant in the mortgage foreclosure action. In count II of the mortgage foreclosure action, Division-Gaylord sought to enforce Konopka's personal guaranty of the loan. Division-Gaylord, however, did not seek to enforce Duba's personal guaranty.

¶ 29　　　　In June and August 2017, a bench trial was held on all of the pending claims. The trial took seven days to complete. A large amount of evidence was presented at the trial, including the testimony of Conrad, Duba, and Duba's son; Konopka's and Conrad's affidavits from a prior summary judgment motion; the letter of intent; the operating agreement; the initial agreement between Konopka and Conrad; the closing documents for the purchase from the railroad; the novation; the letters that Conrad had sent to Konopka in January 2001 and October 2003; the

9

emails that had been sent between Konopka and Conrad in December 2011; various filings and court orders from an ongoing Cook County lawsuit between Konopka and Duba over the industrial park development; and several other pieces of documentary evidence. That evidence established the facts as set forth above. Three additional facts from the trial evidence, however, must be noted: (1) Conrad testified in his trial testimony that his references to the July 12, 2000, agreement (rather than the July 14, 2000, novation) in his letters to Konopka in January 2001 and October 2003 were merely typographical errors; (2) Conrad also testified that he was not involved in the operating agreement, that he never saw the operating agreement, and that he was not aware until June 2014 that the provisions of the operating agreement limited Konopka's authority as the manager of CHLD, although Conrad acknowledged that the June 12, 2000, agreement referred to specific section numbers of the operating agreement; and (3) Konopka stated in his affidavit that he and Conrad had entered into the novation on July 14, 2000, that the novation was not a back-dated forgery, and that Conrad was entitled to a payment of $208,000 pursuant to the terms of the novation. At the conclusion of the evidence portion of the bench trial, the trial court took the case under advisement and allowed the parties to submit written closing arguments. In November 2017, the trial court issued a ruling in favor of Conrad on all claims. In its detailed written decision, the trial court found that that the novation was valid, that Conrad's testimony was credible, and that Duba's testimony was not credible. The trial court awarded Conrad $208,000 plus prejudgment interest. Following the denial of its posttrial motion, CHLD appealed.

¶ 30                                                    II. ANALYSIS

¶ 31                                    A. Conrad's Claim for Money Due and
                                    CHLD's Claims for Quiet Title and Slander of Title

¶ 32        As its first point of contention on appeal, CHLD argues that the trial court erred in finding in Conrad's favor after a bench trial on Conrad's claim for money due and CHLD's claims for quiet title and slander of title. CHLD asserts that the underlying ruling upon which the trial court based its decision on all three claims—that the July 14, 2000, novation was valid— was contrary to established contract law and against the manifest weight of the evidence. More specifically, CHLD claims first that the novation was legally invalid because (1) no consideration was given for the novation and (2) CHLD, Konopka, and Conrad could not agree to the novation, since to do so would violate several provisions of CHLD's operating agreement regarding approval of expenses, fair dealing, and related-party transactions and would also violate certain statutory duties pertaining to members and managers of limited liability companies. Second, CHLD asserts that the trial court's bench-trial ruling was against the manifest weight of the evidence because the evidence clearly showed that (1) the novation was a back-dated forgery, (2) Duba was a credible witness, and (3) Conrad was not a credible witness. For all of the reasons stated, CHLD asks that we reverse the trial court's ruling and that we remand this case with directions to the trial court to enter judgment in favor of CHLD on all three claims and for further proceedings.

¶ 33        Conrad argues that the trial court's ruling was proper and should be upheld. Conrad asserts that the trial court rightly found after conducting a bench trial in this case that (1) valid consideration existed for the novation, (2) Konopka was the manager of CHLD and signed the novation on CHLD's behalf with at least apparent authority, (3) at the time of the novation, Conrad was no longer a member or manager of CHLD and was no longer bound by the managerial and fiduciary duties to which CHLD refers, (4) Conrad was a credible witness, (5) Duba was not a credible witness, (6) Conrad had succeeded in his burden to establish by a

11

preponderance of the evidence that the novation was valid, (7) CHLD had failed in its burden to establish by clear and convincing evidence that the novation was a back-dated forgery, and (8) pursuant to the terms of the novation, Conrad was entitled to payment of $208,000 plus interest. Conrad asks, therefore, that we affirm the trial court's judgment.

¶ 34        A trial court's ruling made after a bench trial will not be reversed on appeal unless it is against the manifest weight of the evidence. *Reliable Fire Equipment Co. v. Arredondo*, 2011 IL 111871, ¶ 12. A ruling is against the manifest weight of the evidence only if it is clearly apparent from the record that the trial court should have reached the opposite conclusion or if the ruling itself is unreasonable, arbitrary, or not based upon the evidence presented. *Best v. Best*, 223 Ill. 2d 342, 350 (2006). Under the manifest weight standard, deference is given to the trial court as finder of fact because the trial court is in a better position than the reviewing court to observe the conduct and demeanor of the parties and witnesses. *Id.* A reviewing court will not substitute its judgment for that of the trial court as to the credibility of witnesses, the weight to be given to the evidence, or the inferences to be drawn from the evidence. *Id.* at 350-51.

¶ 35        The main issue presented at the bench trial in the present case was whether the July 14, 2000, novation was valid and authentic. A novation is a type of substituted contract in which a new obligation or a new party is substituted for an existing one. See Black's Law Dictionary (10th ed. 2014); Restatement (Second) of Contracts § 280 (1981); *Pielet v. Pielet*, 2012 IL 112064, ¶ 52. The result of a novation is that the old obligation/contract is extinguished and a new obligation/contract is created. See Black's Law Dictionary (10th ed. 2014); Restatement (Second) of Contracts § 280 (1981); *Pielet*, 2012 IL 112064, ¶ 52. More specifically, a novation occurs when by mutual agreement, a new debtor or creditor is substituted for an existing debtor or creditor, whereby the old debt is extinguished, or a new debt or obligation is substituted for an

12

existing debt or obligation, which is thereby extinguished. *Pielet*, 2012 IL 112064, ¶ 52. To establish that a valid novation exists, the proponent must prove the following four elements by a preponderance of the evidence: (1) a previous valid obligation, (2) a subsequent agreement of all the parties to the new contract, (3) the extinguishment of the old contract, and (4) the validity of the new contract.[6] *Id.*; *Faith v. Martoccio*, 21 Ill. App. 3d 999, 1003-04 (1974). As with any other contract, to be valid and enforceable, a novation must be supported by good and sufficient consideration. *Faith*, 21 Ill. App. 3d at 1004. With a novation, however, the extinguishment of the original obligation constitutes consideration for the new obligation. 28A Ill. L. and Prac. *Novation* § 3 (2012); Restatement (Second) of Contracts § 280 cmt. c (1981).

¶ 36        After having reviewed the record in the present case, we find that the trial court's ruling—that the novation was valid—was well-supported by the evidence. The evidence presented at the bench trial showed that on July 12, 2000, Conrad and Konopka entered into a valid initial agreement, which established the specific terms for the buyout of Conrad's interest in the subject property. Pursuant to that initial agreement, Conrad was to be paid a total of $350,000 for his interest with $142,000 to be paid up front at the closing of the purchase and the remaining $208,000 to be paid at a later time by Konopka out of Konopka's share of the distributions from CHLD's sales of the industrial park lots. In addition, pursuant to the terms of the initial agreement, Conrad was not allowed to record the agreement against the industrial park property and could not be paid the deferred payment until after CHLD had paid off Duba's initial investment and the bank loan. Two days later, before the initial agreement had been fully

---

[6] Although a novation is generally raised as an affirmative defense, there does not appear to be any reason why Conrad could not raise it as a counterclaim in this case, where Conrad was seeking affirmative relief on the basis of the novation, rather than to merely defeat CHLD's claims. See 735 ILCS 5/2-608(a) (West 2014); 3 Richard A. Michael, Illinois Practice, Civil Procedure Before Trial § 25:4 (1989) (indicating that a counterclaim may be asserted by any defendant who wants to try to obtain an affirmative judgment from any existing party to an action, whether the defendant in the counterclaim is a plaintiff in the original claim or a codefendant with the counterplaintiff).

performed and before either party was in breach of the terms of the initial agreement, Conrad individually and Konopka as the manager of CHLD entered into a valid subsequent agreement—the novation in this case. Consistent with the legal definition of a novation, the July 14, 2000, agreement substituted CHLD for Konopka as the debtor that was responsible for paying the deferred payment to Conrad. See Black's Law Dictionary (10th ed. 2014); Restatement (Second) of Contracts § 280 (1981); *Pielet*, 2012 IL 112064, ¶ 52. The novation also changed some of the terms of the payment in that it gave Conrad a limited right to record his interest against the property and removed the requirement that Conrad had to wait to receive payment until after Duba's initial investment and the bank loan had been paid off. The novation was agreed to by all three of the parties involved—Conrad as the creditor, Konopka (implicitly) as the initial debtor, and CHLD as the substitute debtor (see *Pielet*, 2012 IL 112064, ¶ 52; *Faith*, 21 Ill. App. 3d at 1003-04)—and was supported by good and sufficient consideration in the form of Conrad's agreement to extinguish the old debt owed by Konopka in return for CHLD's promise to pay the new debt (see 28A Ill. L. and Prac. *Novation* § 3 (2012); see also 3 Samuel Williston & Richard A. Lord, A Treatise on the Law of Contracts § 7:20 (4th ed. 2008)). Taken as a whole, the evidence presented at the bench trial amply established that all of the elements required for a valid novation to exist were present in the instant case. See *Pielet*, 2012 IL 112064, ¶ 52; *Faith*, 21 Ill. App. 3d at 1003-04. We conclude, therefore, that the trial court's finding of a valid novation was not against the manifest weight of the evidence. *Best*, 223 Ill. 2d at 350.

¶ 37        Having reached that conclusion, we will now address CHLD's remaining assertions on this issue. First, we do not agree with CHLD's claim that the trial court's ruling was contrary to established contract law. CHLD's assertion in that regard is largely founded upon its contention that consideration was lacking for the novation in this case. As we have noted above, however,

14

the consideration for the novation in the instant case was Conrad's extinguishment of the old debt in exchange for CHLD's promise to pay the new debt. See 28A Ill. L. and Prac. *Novation* § 3 (2012); Restatement (Second) of Contracts § 280 cmt. c (1981); see also 3 Samuel Williston & Richard A. Lord, A Treatise on the Law of Contracts § 7:20 (4th ed. 2008). Since we have found that consideration did, in fact, exist, we will not go beyond that point and determine whether the consideration that was given for the novation was adequate. See *Chandra v. Chandra*, 2016 IL App (1st) 143858, ¶ 16 (recognizing that courts will determine whether consideration exists but will not inquire further beyond that point into the adequacy of consideration). It is also important to note that, at the time of the novation, neither Conrad or Konopka was in breach of the initial agreement and both were free to modify or terminate the agreement (see *Faith*, 21 Ill. App. 3d at 1004 (recognizing that any time prior to breach of a written contract, the parties may, by a new written or oral contract, change the terms of their old contract)). Furthermore, and contrary to CHLD's contention, although Conrad had already executed the assignment, doing so, at most, constituted partial performance of the initial contract, since Conrad had not yet been paid, and would not have legally prevented the parties from extinguishing the initial contract by mutual agreement. See *Printing Machinery Maintenance, Inc. v. Carton Products Co.*, 15 Ill. App. 2d 543, 557 (1957) (indicating that the delivery of machinery pursuant to a contract between the parties constituted only partial performance of that contract and that the parties still had a right, therefore, to rescind the contract by mutual agreement).

¶ 38        Second, we believe that CHLD's claim—that Conrad, Konopka, and CHLD could not legally enter into the novation because doing so would violate several provisions of the operating agreement and certain statutory duties—is, for the most part, misplaced. This case is not a suit

15

against Conrad or Konopka for breach of the fiduciary duties that they owed to CHLD or to Duba as the other member of CHLD. Furthermore, it is clear from the evidence presented that Konopka was the manager of CHLD at the time the novation was entered into, that Duba knew that Konopka was the manager, and that Konopka had at least apparent authority to enter into the novation on behalf of CHLD. Although Conrad acknowledged in his testimony that the July 12, 2000, agreement referred to specific section numbers of the operating agreement, he testified that he was not involved in the operating agreement and that he did not know until June 2014 that the provisions of the operating agreement limited Konopka's authority as the manager of CHLD. The evidence was also clear that prior to the novation, Conrad's interest was in the process of being bought out and that Conrad was no longer a member or manager of CHLD. That CHLD waited until November 2002 to officially withdraw Conrad as a manager of CHLD with the Secretary of State does not change our conclusion in that regard. The filing of the amendment with the Secretary of State was a matter that was solely within CHLD's control and was not indicative of when Conrad's involvement with CHLD actually ended. We agree, therefore, with the trial court's conclusion that, at the time of the novation, Conrad was no longer a member or manager of CHLD and was not bound by the managerial and fiduciary duties to which CHLD refers. We also agree with the trial court's conclusion that Konopka had at least apparent authority to enter into the novation on behalf of CHLD.

¶ 39        Third, we are not persuaded by CHLD's claim that the evidence presented at trial clearly and convincingly showed that the novation was a back-dated forgery. To the contrary, Conrad presented some evidence (Conrad's testimony, Konopka's affidavit, and the novation itself) from which the trial court could have found that the novation was authentic.[7] CHLD, in turn,

---

[7] In pointing out what evidence was before the trial court, we give no weight to the fact that

16

presented some evidence from which the trial court could have inferred that the novation was not authentic and that it had been prepared during or after December 2011 (that it was a back-dated forgery). (This evidence included Conrad's references to the July 12, 2000, agreement, rather than to the July 14, 2000, novation, in his January 2001 and October 2003 letters to Konopka; Conrad's reference in his December 2007 letter regarding his company getting the excavation work for the project, which apparently was a reference to the July 12, 2000, agreement; the December 2011 emails between Konopka and Conrad regarding rememorializing the Shefsky letter; and the fact that Conrad's excavation company, which no longer existed in December 2011, was not given a last look bid right for the project in the novation.) The evidence presented by CHLD (or in CHLD's favor) as to that issue, however, was not of a clear and convincing nature (see *In re Lisa P.*, 381 Ill. App. 3d 1087, 1092 (2008) (indicating that clear and convincing evidence amounts to more than a preponderance but does not quite reach the level of proof of beyond a reasonable doubt)) and had to be weighed by the trial court with the evidence presented by Conrad (or in Conrad's favor) that the novation was authentic. The trial court was in the best position to determine the credibility of the witnesses and to decide how much weight to give to the evidence. See *Best*, 223 Ill. 2d at 350. We will not substitute our judgment for that of the trial court on those matters. See *id.* at 350-51.

¶ 40     Fourth and finally, we note that because the evidence showed that Conrad had a valid basis (the novation) upon which to assert an interest in the industrial park property, CHLD's claims for quiet title and slander of title could not be maintained. See *Lakeview Trust & Savings Bank v. Estrada*, 134 Ill. App. 3d 792, 812 (1985) (recognizing that a party's claimed interest in

CHLD did not produce a report from the analysis of the tests that were run on the ink of the novation. The trial court denied Conrad's motion to compel disclosure of the report, finding that the report was protected attorney work product. Although Conrad argues on appeal that we should consider the failure to tender the report against CHLD, Conrad has not argued on appeal that the trial court's ruling on the motion to compel was erroneous.

real property must be unfounded or inequitable for a cloud on title to exist for the purpose of a suit to quiet title); *American National Bank & Trust Co. v. Bentley Builders, Inc.*, 308 Ill. App. 3d 246, 252 (1999) (indicating that the malice necessary for a slander of title claim cannot be shown if the party who records the document has reasonable grounds to believe that he has title or a claim to the property).

¶ 41                                B. CHLD's Claim for Setoff

¶ 42        As a second and related contention on appeal, CHLD argues that the trial court erred in denying CHLD's claim for setoff against Conrad's claim for money due. CHLD asserts, among other things, that the commission that Conrad received from referring Indeck to CHLD as a purchaser was improper under section 10-15(a) of the Real Estate License Act of 2000 (Act) (225 ILCS 454/10-15(a) (West 2002)) because Conrad was not a licensed real estate agent at the time. As Conrad correctly notes, however, CHLD has no standing to assert that claim because a private right of action does not exist under the Act for CHLD to challenge Conrad's receipt of the payment. See *id.* § 20-125 (indicating that no private right of action exists for violations of the Act except as specifically provided for in the Act); *id.* § 15-5(c) (stating that section 15 of the Act may serve as a basis for a private right of action, but that the private right of action does not extend to other provisions of the Act). Rather, CHLD's remedy is to report Conrad's receipt of the payment to the appropriate regulating authority. Having determined that CHLD has no standing to make this claim, we need not address the parties' other arguments on this issue.

¶ 43                                III. CONCLUSION

¶ 44        For the foregoing reasons, we affirm the judgment of the circuit court of Will County.

¶ 45        Affirmed.