# ILLINOIS OFFICIAL REPORTS

## Appellate Court

---

*Joyce v. Fidelity Real Estate Growth Fund II, L.P.*, 2013 IL App (1st) 121697

---

| | |
|---|---|
| Appellate Court Caption | EDWARD J. JOYCE, Not Individually but, Derivatively on Behalf of Neighborhood Rejuvenation Partners, L.P., Plaintiff-Appellant, v. FIDELITY REAL ESTATE GROWTH FUND II, L.P., and NEIGHBORHOOD REJUVENATION PARTNERS, L.P., Defendants-Appellees. |
| District & No. | First District, Third Division<br>Docket No. 1-12-1697 |
| Filed<br>Rehearing denied | June 19, 2013<br>July 23, 2013 |
| Held<br>(*Note: This syllabus constitutes no part of the opinion of the court but has been prepared by the Reporter of Decisions for the convenience of the reader.*) | Summary judgment was properly entered for defendant lender in an action alleging that defendant breached the parties' forbearance agreement by filing a deed in lieu of foreclosure, since the record did not support plaintiff's claims that it cured the default or, in the alternative, that the default was not material. |
| Decision Under Review | Appeal from the Circuit Court of Cook County, No. 10-CH-05321; the Hon. Raymond W. Mitchell, Judge, presiding. |
| Judgment | Affirmed. |

| Counsel on Appeal | Arthur W. Aufmann, of Law Offices of Edward T. Joyce & Associates, P.C., of Chicago, for appellant. |
| | |
| | Theresa L. Davis, of Loeb & Loeb LLP, of Chicago, for appellees. |
| | |
| Panel | JUSTICE HYMAN delivered the judgment of the court, with opinion. Presiding Justice Neville and Justice Sterba concurred in the judgment and opinion. |

## OPINION

¶ 1    While the real estate tumble over the past several years may have doomed many real estate projects and investments, it also caused a mini-boom for lawsuits by disgruntled developers, owners, and investors. This is one of those cases. In 2005, a limited liability company, the owner and developer of a highly touted luxury condominium, borrowed $18 million in exchange for a second loan on the property and a pledge of 100% of its ownership interest. Four years later, the project agreed to a forbearance agreement to stave off foreclosure. But, almost immediately after the forbearance failed, plaintiff, Edward T. Joyce, on behalf of Neighborhood Rejuvenation Partners, L.P. (NRP), sued defendant Fidelity Real Estate Growth Fund II, L.P., claiming that Fidelity breached the forbearance agreement by filing a deed in lieu of foreclosure in the absence of a material default by NRP. Except, the trial court concluded NRP committed a material default, and entered an order granting Fidelity summary judgment. We affirm.

¶ 2                                  Background

¶ 3    The Columbian, LLC, a Delaware limited liability company, owned and developed a luxury condominium building at 1160 S. Michigan Avenue in Chicago's South Loop neighborhood. The Columbian was wholly owned by NRP, a Delaware limited partnership. The general partner of NRP, Allison Davis, managed the Columbian project. In September 2005, the Columbian obtained a $92 million loan from Corus Bank in exchange for a first mortgage lien on the Columbian property. The Columbian also executed a loan agreement with Fidelity Real Estate Growth Fund II, L.P., for $18 million in exchange for a second lien on the property and a pledge of a 100% ownership interest in the Columbian. Davis, individually and on behalf of Neighborhood Rejuvenation Partners, L.P., signed a guaranty and noncompetition agreement with Fidelity.

¶ 4    In March 2009, the Columbian defaulted on both the Corus Bank loan and the Fidelity loan. The Corus Bank loan was fully paid off in May 2009. Fidelity wrote Columbian's managers and the loan's guarantors notifying them of the default, as well as reserving Fidelity's rights and remedies, and offering to negotiate a forbearance agreement. On March

-2-

10, 2009, the parties signed an interim letter agreement stating their mutual interest in negotiating a forbearance agreement. After four months of negotiations, on July 9, 2009, the Columbian, NRP, and Davis, individually and on behalf of the Columbian and NRP (collectively borrowers), entered into a forbearance agreement with Fidelity. Under the terms of the forbearance agreement, which stated Massachusetts law governed, the borrowers acknowledged that existing defaults had occurred and were continuing, and that they had no disputes, defenses, or counterclaims with respect to the defaults. The borrowers also acknowledged Fidelity had the right to immediately enforce its security interest in the property and any other collateral.

¶ 5        To induce Fidelity to forgo exercising its rights and remedies, the borrowers agreed to use their best efforts to repay the loan in full by selling any unsold condominium units before the expiration of the forbearance period on September 30, 2012. To ensure the borrowers would make progress in selling condominium units to repay the loan, the borrowers had to achieve "aggregate sales goals" every three months, as set forth in schedule II of the forbearance agreement. The aggregate sales goal for December 31, 2009, was $5 million. Schedule II stated that "the sales goals are measured by the gross sales price of Units."

¶ 6        The forbearance agreement provided that the borrowers would be in default if they "fail[ed] to achieve any of the Aggregate Sales Goals as and when specified in Schedule II," if "such failure *** continue[d] for thirty (30) days after the time specified for the applicable Aggregate Sales Goal." The agreement further provided that, "Upon the occurrence of any Forbearance Default, Lender may by notice to Borrower, immediately terminate the Forbearance Period and/or declare all of the Obligations immediately due and payable. In the event that all outstanding Obligations shall not be paid in full promptly upon the expiration or termination of the Forbearance Period, Lender shall be entitled to exercise all of its rights and remedies hereunder, under the other Forbearance Documents, under the Loan Documents or otherwise available to Lender at law and equity, including, without limitation, the right to enforce its liens on, and security interests to, the Collateral."

¶ 7        The borrowers agreed to deliver into escrow a "deed in lieu of foreclosure" and related documents necessary to transfer unsold units to Fidelity, which would be released from escrow if any further event of default occurred. The borrowers further agreed "not to interfere with the exercise of any right or remedy by Lender under [the Forbearance] Agreement *** or the Loan Documents after the occurrence of a Forbearance Default." In particular, the borrowers agreed "not to seek to enjoin, hinder, delay or impair Lender's exercise of any such rights or remedies."

¶ 8        On January 4, 2010, less than six months after the parties entered into the forbearance agreement, Fidelity sent a letter to the borrowers notifying them of several defaults, including the failure to achieve the aggregate sales goal of $5 million by December 31, 2009. (Fidelity also claimed the borrowers were in default for failing to prepare and submit for approval an operating budget for 2010 and failing to timely deliver quarterly financial statements for the quarter ending September 30, 2009. Neither of those alleged defaults is raised in this appeal.) The letter included a chart summarizing the closed sales for 2009 and showing that nine units had been sold for a "total purchase price" of $4,497,000, a shortfall of $503,000. Fidelity informed the borrowers they had 30 days to cure the default, as permitted by the forbearance

agreement.

¶ 9    During the cure period, Fidelity corrected some errors in its $503,000 shortfall calculation. Specifically, Fidelity reduced the amount by $415,000 to reflect the January 19, 2010, closing on a condominium unit and a parking space, and corrected the purchase price on two other units that had been sold for a higher amount than was reflected on Fidelity's summary chart. After those corrections were made, the borrowers were still $75,500 short of the $5 million aggregate sales goal. Fidelity sent two letters to the borrowers, dated February 1 and February 2, 2010, requesting the borrowers "provide any corrected information with respect to the Borrower's achievement of the Aggregate Sales Goals." The borrowers provided no additional corrections to Fidelity's shortfall calculation. On February 3, in response to the borrowers' uncured default, Fidelity filed a deed in lieu of foreclosure conveying the unsold Columbian condominium units to a subsidiary of Fidelity.

¶ 10    Two days later, Edward Joyce, a limited partner in NRP, filed a derivative complaint on NRP's behalf, claiming Fidelity breached its duty of good faith and fair dealing regarding the loan and forbearance agreements and seeking a declaration that Fidelity's notices of default under the agreements were improper and invalid. Fidelity filed a motion to dismiss under section 2-619.1 of the Illinois Code of Civil Procedure (Code) (735 ILCS 5/2-619.1 (West 2008)). On July 13, 2010, the trial court granted the motion to dismiss with leave to file an amended complaint.

¶ 11    Joyce filed an amended derivative complaint on August 4, 2010. The amended derivative complaint sought to recover damages caused by Fidelity's breaches of the forbearance agreement (count I), the loan agreement (count II), and the implied covenants of good faith in both agreements. In count I, Joyce claimed, for the first time, that the borrowers had cured any purported shortfall in the $5 million aggregate sales requirement due to a January 6, 2009, transaction involving the exchange of parking spaces by an existing condominium owner. The Columbian had originally sold parking units 618 and 619 in October 2007, in conjunction with the purchase of condominium unit 3901. The unit owners paid $70,000 for the two parking spaces. In January 2009, the owners exchanged parking spaces 618 and 619 for parking spaces 303 and 304. At the closing of the parking space exchange, the owners received a debit of $70,000, reflecting the original price for spaces 618 and 619, and paid $25,000 for the higher priced parking spaces 303 and 304. In August 2009, the Columbian resold parking spaces 618 and 619 to the owners of condominium units 2702 and 2902 for $40,000 each. Fidelity applied an $80,000 credit toward the borrowers' aggregate sales goal. Joyce argued, however, that the borrowers should also be credited $95,000 for the parking space exchange and that when that amount is added to the $4,924,500 in unit sales, the December 2009 shortfall of $75,500 becomes a $19,500 surplus. Therefore, Joyce asserted, Fidelity breached the forbearance agreement by filing a deed in lieu of foreclosure when the borrowers were not in default.

¶ 12    Fidelity filed a motion to dismiss the amended complaint. Joyce did not respond to the motion but instead filed a second amended complaint on February 18, 2011, which added an additional estoppel count, asserting that Fidelity was not entitled to pursue any remedies as a result of the borrowers' default, because Fidelity had caused the default by hindering the borrowers' sales efforts. On March 3, 2011, the case was transferred from the chancery

division to the law division. On May 20, 2011, Fidelity filed a motion to dismiss the second amended complaint under section 2-619.1 of the Code, and the trial court dismissed counts II and III, with prejudice, for failing to state a claim, on September 23, 2011. In count I, the sole remaining claim, Joyce alleged Fidelity breached the forbearance agreement by filing a deed in lieu of foreclosure, because the borrowers cured the conditional default within the 30-day period allowed by the agreement. Joyce claimed Fidelity should have credited the borrowers with additional sales of $95,500 for parking space exchange, which would have been sufficient to put them in compliance with the December 31, 2009, sales quota of $5 million.

¶ 13 On February 16, 2012, Fidelity filed a motion for summary judgment on count I under section 2-1005 of the Code (735 ILCS 5/2-1005 (West 2008)). Fidelity asserted that the parking space exchange, which occurred on January 6, 2009, before the parties signed the forbearance agreement, was not included in the list of confirmed unit closings in paragraph 21 of the agreement. Therefore, Fidelity argued, the exchange was not intended by the parties to be used to achieve the required aggregate sales goals. Further, even if the parking space exchange was included in the list, it generated, at most, $25,000 in gross sales to be counted toward the aggregate sales goal, not enough to overcome the $50,500 shortfall toward the $5 million goal for December 31, 2009. Fidelity asserted that including the $70,000 debit as part of the "gross sales price" for the parking space exchange ignored the purpose of the sales benchmarks, which was to reflect the borrowers' progress toward repaying the loan. Therefore, Fidelity argued, since the borrowers failed to meet the aggregate sales goal, it was entitled to summary judgment on Joyce's claim that it breached the forbearance agreement by filing a deed in lieu of foreclosure.

¶ 14 In response, Joyce argued Fidelity's termination of the forbearance agreement was unjustified because the borrowers met the $5 million aggregate sales goal. Alternatively, Joyce asserted, at worst, the borrowers missed the goal by $75,500 or 1.5%, an "immaterial" breach that would not justify the agreement's termination.

¶ 15 The trial court granted Fidelity's motion for summary judgment on May 7, 2012. The court held that to give effect to the parties' intent at the time they entered the forbearance agreement, the total amount charged to the owner who exchanged the parking spaces cannot be considered part of the "gross sales price" without considering the credit for the exchange. The court agreed with Fidelity that, otherwise, the sales quota would have been illusory because the borrowers could simply engineer similar transactions to defeat their obligations. The court stated, "the purpose of imploring the sales quota was to ensure that Fidelity would be repaid for a loan that was already in default. Allowing transactions such as this to count toward the sales quota does nothing to further any assurance to Fidelity that it will be repaid. *** The type of exchange at issue here cannot reasonably be said to be what the parties intended."

¶ 16 The court also rejected Joyce's argument that any breach by the borrowers was immaterial and did not permit Fidelity to file a deed in lieu of foreclosure. First, the court noted the borrowers were already in default under the original loan agreement and "[w]hen Fidelity agreed to forbear, it had the right to expect strict compliance with the terms of the forbearance agreement. *** The parties did not agree that only a material breach would cause

a default, but rather than *any* failure to meet the sales quota would be a default. Fidelity was entitled to pursue its remedies upon Neighborhood Rejuvenation's forbearance default." (Emphasis in original.)

¶ 17 The court further held that even applying the materiality rule set forth by Joyce, the breach was indeed material and entitled Fidelity to file the deed in lieu of foreclosure under the terms of the forbearance agreement. In Massachusetts, whose law applies to the forbearance agreement, courts look to several factors in determining whether a breach is material: (1) the extent to which the injured party will be deprived of the benefit which he or she reasonably expected; (2) the extent to which the injured party can be adequately compensated for the part of that benefit of which he or she will be deprived; (3) the extent to which the party failing to perform or to offer to perform will suffer forfeiture; (4) the likelihood that the party failing to perform or to offer to perform will cure the failure, taking account of all the circumstances including any reasonable assurances; and (5) the extent to which the behavior of the party failing to perform or to offer to perform comports with standards of good faith and fair dealing. *O'Connell Management Co. v. Carlyle-XIII Managers, Inc.*, 765 F. Supp. 779, 783 (D. Mass. 1991).

¶ 18 Applying those factors, the court first noted Fidelity was greatly deprived of its expected benefit, which was repayment of the loan, particularly since the default occurred so quickly after the parties entered the forbearance agreement. Second, Fidelity could only be adequately compensated for its injury by filing the deed in lieu of foreclosure, because the borrowers had defaulted on their financial obligations twice and failed to cure. Third, the borrowers did not suffer a forfeiture because they had already defaulted on the original loan and had agreed to deliver a deed in lieu of foreclosure in return for forbearance. Fourth, it was unlikely the borrowers would cure the default since they already had the opportunity to do so and had failed and because this was only the second deadline in a list of 13 deadlines. Lastly, the court stated that the borrowers' good faith was not determinative because a party can exercise good faith and still materially breach a contract. The court, therefore, held that the borrowers' breach was material, and Fidelity was entitled to file the deed in lieu of foreclosure.

¶ 19 Joyce appealed, asking this court to vacate the trial court's summary judgment order asserting that Fidelity breached the forbearance agreement where the borrowers had not defaulted on the agreement. Alternatively, Joyce argues if the borrowers did default by failing to meet the December 31, 2009, aggregate sales goal, it was only a $50,500 shortfall, *i.e.*, 1.5% of the $5 million requirement, and that Massachusetts law does not permit a party to terminate a forbearance agreement based on an immaterial breach.

¶ 20 Fidelity asserts the trial court correctly found that under the terms of the forbearance agreement, not only was the parking space exchange not a "sale," but in addition, the borrowers' failure to satisfy the December 31, 2009, aggregate sales goal expressly entitled Fidelity to exercise any of its rights and remedies under the forbearance and loan agreements, including the recording of a deed in lieu of foreclosure. Further, Fidelity asserts, even were the materiality of the breach an issue, the borrowers' failure to satisfy the aggregate sales goal constitutes a material default. Alternatively, Fidelity argues Joyce is equitably estopped from relying on the parking space exchange to satisfy the aggregate sales goal because the borrowers did not identify the transaction during the cure period despite Fidelity's repeated

written requests, and Fidelity acted in good faith in relying on the borrowers' silence when exercising its rights and remedies.

¶ 21                                    Standard of Review

¶ 22    Summary judgment may only be granted "if the pleadings, depositions, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." 735 ILCS 5/2-1005(c) (West 2008). In considering summary judgment, the court must view the record in the light most favorable to the nonmoving party. *Home Insurance Co. v. Cincinnati Insurance Co.*, 213 Ill. 2d 307, 315 (2004). This court reviews the circuit court's ruling on a motion for summary judgment *de novo*. *Id*.

¶ 23    Under Massachusetts law, which applies to the forbearance agreement, interpretation of an unambiguous contract usually presents a question of law appropriate for summary disposition. *Bank v. International Business Machines Corp.*, 145 F.3d 420, 424 (1st Cir. 1998). Under ordinary principles of contract interpretation, a court "must interpret the words in a contract according to their plain meaning." (Internal quotation marks omitted.) *Polito v. School Committee of Peabody*, 868 N.E.2d 624, 626-27 (Mass. App. Ct. 2007). A court also gives effect to the parties' intentions and "construe[s] the contract with reference to the situation of the parties when they made it and to the objects sought to be accomplished." (Internal quotation marks omitted.) *Starr v. Fordham*, 648 N.E.2d 1261, 1269 (Mass. 1995). "When construing a commercial contract, '[c]ommon sense is as much a part of contract interpretation as is the dictionary or the arsenal of canons.' " *Teragram Corp. v. Marketwatch.com, Inc.*, 444 F.3d 1, 9 (1st Cir. 2006) (quoting *Fishman v. La Salle National Bank*, 247 F.3d 300, 302 (1st Cir. 2001)).

¶ 24                                Aggregate Sales Requirement

¶ 25    Joyce first contends the trial court erred in granting summary judgment because the borrowers met the $5 million aggregate sales requirement, and therefore, the court should have found Fidelity breached the forbearance agreement by recording a deed in lieu of foreclosure in the absence of a default. For the plain and ordinary meaning of "gross sales price," Joyce cites to Black's Law Dictionary definition–the total sales before deductions. Blacks Law Dictionary 1455 (9th ed. 2009). Joyce contends the borrowers should have been credited $95,000 for the parking space exchange transaction, rather than $25,000, because under the plain meaning of "gross sales price," the trial court should have left undisturbed the $70,000 debit given to the unit owners for trading in their old parking spaces. Since the shortfall was $50,500, Joyce asserts that the $95,500 ($70,000 plus $25,000) transaction put the borrowers' aggregate gross sales over $5 million.

¶ 26    The trial court rejected Joyce's interpretation as "unreasonable" because "[t]he type of exchange here cannot reasonably be said to be what the parties intended." When the parties entered into the forbearance agreement, the borrowers were in default on the underlying loan. The borrowers, as set out in the forbearance agreement, agreed to "use best efforts to repay the Loan in full on or before the expiration of Forbearance Period by selling any unsold

-7-

condominium Units during the Forbearance Period." To ensure the borrowers would make sufficient progress toward repaying the loan, the forbearance agreement included specific sales benchmarks that the borrowers "must achieve." Permitting the borrowers to claim $95,000 would be inconsistent with the intent of the forbearance agreement, which was to ensure Fidelity that the loan would be repaid according to the schedule set out in the agreement. As the trial court stated, "It would be illogical to include the full amount of a transaction when the transaction only brought the company a fraction of the total amount." Therefore, we affirm the trial court's finding that the borrowers should be credited $25,000, rather than $95,000, for the parking space transaction.

¶27    Further, Joyce fails to acknowledge that the borrowers were credited $80,000 toward the aggregate sales goal when they resold the two parking spaces in August 2009 to new condominium owners. If we were to credit the Columbian $95,000 without any deductions for the trade-in of the parking spaces, it would only make sense to also deduct the $80,000 the borrowers were credited for in connection with the resale of those spaces. In that event, the borrowers would have still failed to reach the mandatory $5 million goal by the deadline.

¶28    Therefore, the trial court did not err in finding that, given the intent of the parties in entering into the forbearance, the borrowers should not be credited the total amount charged to the parking space purchasers without also deducting the amount of credit they received for the exchange. Hence, the borrowers were $50,500 short of the $5 million aggregate sales goal for December 31, 2009, and therefore, defaulted under the forbearance agreement.

¶29    Accordingly, we need not reach Fidelity's argument that Joyce is equitably estopped from asserting that the parking space transaction should be included as a sale.

¶30                                      Material Default

¶31    Next, Joyce argues even if the borrowers defaulted, Massachusetts law says it was an immaterial default that did not permit Fidelity to terminate the forbearance agreement. According to Joyce, Massachusetts law only permits a party to terminate a contract if the other party commits a "material" breach. For support, Joyce heavily relies on *Lease-It, Inc. v. Massachusetts Port Authority*, 680 N.E.2d 599 (Mass. App. Ct. 1992).

¶32    *Lease-It* involved a dispute between a car rental company and the Massachusetts Port Authority (Massport), which manages Boston's Logan International Airport. The rental company had a curbside agreement with Massport that allowed the company to drive its courtesy vehicles to the airport to serve its customers. *Id*. The rental company also had a concession agreement with Massport that gave it the nonexclusive right to conduct a car rental business at the airport in exchange for an annual concession fee and monthly rental fees. *Id*. at 599-600. When Massport announced it intended to erect barriers at the airport perimeter that would block access to the airport, the rental company filed a complaint against Massport alleging breach of contract and stopped paying its monthly rental fees under the concession contract. *Id*. at 600. Massport did not close the rental company's counters or rescind the concession contract, and the parties eventually reached an agreement regarding access to the airport. The issue of damages was tried before a jury, which found that by closing access to the airport, Massport committed an immaterial breach of the agreement.

The jury also found the rental company breached the concession agreement by refusing to pay rental fees, though it did not determine whether the breach was material or immaterial. *Id*. at 601. The jury awarded damages to the rental company with a deduction for the amount of rental fees it owed Massport.

¶ 33 Massport appealed, arguing it did not owe any damages because the rental company committed a material breach of the agreement by refusing to pay monthly rental fees, which terminated its obligations under the agreement. The appellate court stated that "[w]hether a breach is material or immaterial normally is a question for the [fact finder] to decide. 6 Williston, [Contracts] § 841, at 159. \*\*\* A material breach of an agreement occurs when there is a breach of 'an essential and inducing feature of the contract[ ].' [Citation.]" *Id*. at 602. "When a party to an agreement commits an immaterial breach of that agreement, the injured party is entitled to bring an immediate action for damages; it may not stop performing its obligations under the agreement." *Id*. (citing E. Allan Farnsworth, Contracts § 8:16, at 442 (2d ed. 1990)).

¶ 34 Joyce asserts that *Lease-It* supports his argument that under Massachusetts law, Fidelity was only entitled to stop performing under the forbearance agreement if the borrowers were in material default of the agreement. Therefore, as the *Lease-It* court held, absent a material breach by the borrowers, Fidelity was only entitled to bring an immediate action for damages, but could not terminate the agreement and file a deed in lieu of foreclosure.

¶ 35 This case is distinguishable, however. In *Lease-It*, both parties were in breach of the agreement, with the rental company claiming its breach was excused by the airport's breach in closing off access to the airport. But, here Fidelity had not breached at all. It was simply exercising its rights under the forbearance agreement, which expressly provided that "[u]pon any Event of Default other than the Existing Defaults, Lend may, in its sole discretion, exercise any rights and remedies under the Loan Documents or otherwise." The forbearance agreement permitted Fidelity to seek remedies on *any* further event of default, regardless of whether it was deemed "material." Therefore, once the borrowers failed to reach the December 31, 2009, aggregate sales goal, they were in default. Since the borrowers failed to cure the default, Fidelity was permitted under the express terms of the forbearance agreement to pursue its available remedies, including filing a deed in lieu of foreclosure.

¶ 36                                                   Conclusion

¶ 37 Joyce's claim that Fidelity is liable for breaching the agreement by wrongly pursuing its remedies under the forbearance agreement is in error. Fidelity is entitled to judgment as a matter of law. Thus, we affirm the trial court.

¶ 38 Affirmed.