2023 IL App (1st) 221156-U

THIRD DIVISION
June 28, 2023

No. 1-22-1156

**NOTICE:** This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

_____

IN THE
APPELLATE COURT OF ILLINOIS
FIRST JUDICIAL DISTRICT

_____

| | | |
|---|---|---|
| METROPOLITAN CAPITAL BANK & TRUST, | ) | Appeal from the |
| | ) | Circuit Court of |
| Plaintiff-Appellant, | ) | Cook County |
| | ) | |
| v. | ) | No. 19 L 1133 |
| | ) | |
| ALICIA ENGSTROM and HOSAIN RAHMAN, | ) | Honorable |
| | ) | Michael F. Otto, |
| Defendants-Appellees. | ) | Judge Presiding. |

_____

JUSTICE REYES delivered the judgment of the court.
Presiding Justice McBride and Justice Burke concurred in the judgment.

**ORDER**

¶ 1 *Held*: Reversing the grant of summary judgment in favor of a borrower and remanding for the circuit court to enter summary judgment in favor of the lender, where the borrower failed to comply with the terms of the parties' forbearance agreement; affirming the grant of summary judgment in favor of the borrower's spouse, who was a signatory to the forbearance agreement but not a borrower under the loan documentation.

¶ 2 Hosain Rahman (Rahman) borrowed funds from Metropolitan Capital Bank & Trust (the bank). After he defaulted on the loan, Rahman and his wife Alicia Engstrom (Engstrom) entered into a forbearance agreement with the bank. Although Rahman and Engstrom (the obligors) made the payments required by the forbearance agreement, they failed to comply with certain nonmonetary obligations under the agreement, *e.g.*, the pledge of specified securities.

The bank filed a complaint in the circuit court of Cook County against the obligors for breach of the forbearance agreement, seeking the full balance owed under the loan documentation. The circuit court ultimately granted summary judgment in favor of the obligors, finding that the bank did not suffer any loss due to the obligors' default under the forbearance agreement.

¶ 3    On appeal, the bank argues that: (a) the circuit court improperly imposed a "materiality" requirement into the forbearance agreement, *i.e.*, requiring a *material* breach even though the agreement did not so provide; and (b) even if a materiality requirement applied, the obligors' breach of the forbearance agreement was material. The obligors contend, in part, that the bank is not entitled to collect payment for the underlying debt as damages for the breach of the forbearance agreement. As discussed below, we reverse the grant of summary judgment in favor of Rahman and remand to the circuit court to enter judgment in favor of the bank and against Rahman. As to Engstrom, we affirm the grant of summary judgment in her favor.

¶ 4                                BACKGROUND

¶ 5                        *The Loan and the Amendments*

¶ 6    The bank and Rahman entered into a loan agreement and related agreements in late 2013, whereby the bank extended a $1.5 million revolving loan to Rahman. The loan was secured by specified collateral, including shares of "AliphCom."

¶ 7    The bank and Rahman then agreed to and entered into a series of amendments to the loan agreement. The first amendment, executed in 2014, increased the revolving loan commitment to $2.75 million. The first amendment acknowledged that an event of default had already occurred, *i.e.*, failure to pay certain charges related to the collateral. A second amendment in 2015 increased the commitment to $3 million and extended the maturity date of the loan. In the third and fourth amendments, both executed in 2016, the bank agreed to certain additional financial

accommodations requested by Rahman, including extensions of the loan maturity date.

¶ 8    In September 2016, the bank and Rahman entered into a "Forbearance Agreement and Fifth Amendment to Loan Agreement" (fifth amendment).  The fifth amendment stated that Rahman had requested that the bank (a) forbear from exercising certain rights based on his existing defaults, (b) extend the loan maturity date, and (c) provide a new line of credit loan in the amount of $375,000.  The bank agreed to these accommodations but required additional collateral, *i.e.*, real estate owned by the obligors in San Francisco (the San Francisco property).

¶ 9                                    *The Forbearance Agreement*

¶ 10    On July 1, 2018, the bank and the obligors (Rahman and Engstrom) entered into the forbearance agreement at issue in this appeal.  In the forbearance agreement, the parties agreed that there were existing defaults under the loan documentation including: failure to make interest payments; failure to provide required financial statements, brokerage statements, and tax returns; failure to comply with net worth and liquidity requirements; defaulting on specified indebtedness to another lender; failing to deliver rental income from the San Francisco property; failing to timely replace the AliphCom stock with other collateral when the stock diminished in value (as required by the fifth amendment); and failing to repay the bank in full on the revolving loan maturity date.  The forbearance agreement noted that the bank had commenced a non-judicial foreclosure as to the San Francisco property.

¶ 11    In the forbearance agreement, the parties agreed that the loan documentation constituted valid and binding obligations of the obligors, enforceable against the obligors in accordance with their terms.  The agreement provided that the total outstanding liabilities owed by Rahman under the loan documentation were: (1) $3,429,760.97 in principal; (2) $223,411.50 in unpaid interest; (3) $144,811.51 in default interest calculated since the revolving loan maturity date; (4) $800 in

other bank fees and expenses; (5) legal fees related to the enforcement of the bank's rights under the loan documentation, estimated at $94,286.99; and (6) unbilled legal fees.

¶ 12    The forbearance agreement provided that if the obligors "fully and timely" satisfied and performed "each of the conditions, covenants, terms and provisions" set forth in the forbearance agreement – and no other breaches or defaults occurred under the forbearance agreement or the loan documentation – the bank agreed to forbear from exercising its rights and remedies arising from the existing defaults.  Among other things, the obligors agreed to make two payments: (a) all proceeds from the sale of the San Francisco property, on or before July 16, 2018, and (b) $300,000 on or before July 1, 2019 (the 2019 payment).  The obligors also agreed to pay the bank 80% of any net cash proceeds received from each cash bonus received by Rahman in the forbearance period (*i.e.*, until July 1, 2019) from his work for "Jawbone Health Hub, Inc." (Jawbone) or any other organization, together with evidence of the total bonus amount received by Rahman.

¶ 13    The forbearance agreement further stated that "in consideration of the diminution of value of the AliphCom Stock Collateral and pursuant to Section 7.3[1] of the Loan Agreement," if the 2019 payment was not made on or before January 1, 2019, then Rahman was required to pledge his stock in Jawbone in an amount equal to the 2019 payment (the Jawbone pledge) on January 1, 2019.  The forbearance agreement provided that the Jawbone pledge would serve as additional collateral for the 2019 payment and that Rahman was required to deliver a valuation of the Jawbone stock.  The forbearance agreement further provided that if the 2019 payment was not made – and if the Jawbone pledge was not made – as of January 1, 2019, then Rahman was

---

[1] As provided in the fifth amendment, section 7.3 required, in part, that Rahman pledge additional shares of AliphCom to the extent of any diminution in value of the AliphCom shares already pledged as collateral under the loan documentation.

required to pledge his equity interests in "Social+Capital Partnership II, L.P." in an amount equal to the 2019 payment (the Social Capital pledge) as additional collateral for such payment. He was similarly required to deliver a valuation of the Social Capital equity.

¶ 14     The forbearance agreement provided that the occurrence of any "breach, default, or noncompliance" with the terms of the agreement would automatically terminate the bank's agreement to temporarily forbear, and the bank would be entitled to (a) demand that the liability under the loan documentation would be immediately due and payable and (b) immediately exercise all rights and remedies afforded under the loan documentation without any further notice to the obligors.

¶ 15     The record indicates that the San Francisco property was sold, and the sale proceeds were distributed to the bank as contemplated by the forbearance agreement. As discussed below, however, the obligors failed to effectuate the Jawbone pledge or the Social Capital pledge after not making the 2019 payment by January 1, 2019.

¶ 16                    *The Complaint, Answer, and Affirmative Defenses*

¶ 17     In February 2019, the bank filed a verified complaint for breach of the forbearance agreement against the obligors in the circuit court of Cook County. The bank alleged that the obligors breached the forbearance agreement by failing to: (a) execute and deliver the Jawbone pledge, or alternatively the Social Capital pledge, on January 1, 2019; (b) provide a valuation and other required documentation relating to the Social Capital equity; and (c) confirm that Rahman had not received cash bonuses from Jawbone or any other organization (80% of which would be payable to the bank).

¶ 18     Based on the foregoing breaches of the forbearance agreement, the bank sought the entire amount of the remaining indebtedness from Rahman, which was $766,737.58, as of January 15,

2019, plus interest and attorney fees and costs. As to Engstrom, the bank sought $300,000 – the amount of the 2019 payment – plus interest and attorney fees and costs.

¶ 19    The obligors filed an answer and affirmative defenses in May 2019. In their first affirmative defense, the obligors alleged that the bank waived any claim of default under the forbearance agreement by previously waiving strict compliance with the loan documentation. In their second affirmative defense, the obligors alleged they had not breached the forbearance agreement, as the 2019 payment of $300,000 was not due until July 1, 2019.

¶ 20                    *The Initial Cross-Motions for Summary Judgment*

¶ 21    On June 11, 2019, the bank filed a motion for summary judgment on its complaint and the obligors' affirmative defenses pursuant to section 2-1005 of the Code of Civil Procedure (Code) (735 ILCS 5/2-1005 (West 2018)). The bank contended that the obligors defaulted under the forbearance agreement by, among other things, failing to effectuate the Jawbone pledge or the Social Capital pledge on January 1, 2019. The bank further argued, in part, that the obligors expressly "waived any claim of waiver" in the forbearance agreement. In an affidavit appended to the summary judgment motion, a bank executive detailed the amounts owed under the loan documentation. Another attachment to the motion was a default letter sent by the bank to the obligors dated January 15, 2019, enumerating the breaches of the forbearance agreement.

¶ 22    On July 23, 2019, the obligors filed a combined response to the bank's motion for summary judgment and a cross-motion for summary judgment. The obligors maintained that they timely made a payment of $300,000 on July 1, 2019, and therefore were in "full compliance" with the terms of the forbearance agreement. According to the obligors, the Jawbone pledge or the Social Capital pledge was intended to serve as collateral for the $300,000 payment, and thus "the intended purpose of the collateral is now moot given there is no longer

any debt to satisfy." The obligors contended that the bank suffered no damages based on their alleged breach of the nonmonetary terms of the forbearance agreement. In an affidavit appended to the motion, Rahman averred that he did not receive any applicable bonus payments from Jawbone or any other organization. Rahman further averred that the bank "never required strict compliance with any of the non-monetary provisions" in any of the parties' agreements prior to the filing of the instant litigation.

¶ 23    In its reply in support of its motion for summary judgment, the bank argued that the payment on July 1, 2019, did not negate or cure the breaches of the forbearance agreement which had occurred on January 1, 2019. The bank further observed that Rahman did not dispute that he failed to comply with multiple covenants in the forbearance agreement and that Engstrom had not submitted any affidavit. According to the bank, the forbearance agreement terminated when the obligors breached, and the bank was entitled to pursue and collect the *entire* indebtedness owed under the loan documentation. Attached to the reply was a stipulation wherein the parties had expressly agreed that the payment of the $300,000 amount on July 1, 2019, would reduce the total amount owed to the bank but would not "in any way affect, impair, waive, or release any of the claims or defenses by any of the parties in the lawsuit."

¶ 24    In an order entered on September 19, 2019, the circuit court[2] denied the cross-motions for summary judgment. The circuit court found that there was no genuine issue of material fact that the obligors had defaulted under a specified section of the forbearance agreement but that "a genuine issue of fact remains as to [the bank's] damages."

---

[2] Judge Brigid Mary McGrath entered this order; subsequent orders in this matter were entered by Judge Michael F. Otto.

¶ 25                    *The Bank's Second Motion for Summary Judgment*

¶ 26    On October 30, 2020, the bank filed a motion for summary judgment on count I of its complaint (against Rahman) and as to the obligors' affirmative defenses.  The bank argued, in part, that the forbearance agreement "could not be more clear on damages," *i.e.*, the agreement automatically terminated in the event of a default thereunder, and all remaining amounts owed under the loan documentation became immediately due and payable.  Characterizing the obligors' $300,000 payment as a "vain attempt to 'cure' their breach," the bank observed that the parties had explicitly agreed that the bank was accepting the funds as a partial payment of the remaining indebtedness.  The bank also appended a "courtesy letter" which was sent to the obligors on December 12, 2018, wherein the bank reminded them of the then-upcoming January 1, 2019, deadline relating to the stock pledges and other matters.

¶ 27    The bank maintained that the forbearance agreement did not require any breach to be "material," and even if there was such a materiality requirement, the requirement was satisfied in this case.  The bank also noted that Rahman had indicated in discovery responses that he never owned any stock in Jawbone or Social Capital.  According to the bank, Rahman's promise to pledge the stock was "an empty one at best, and a fraudulent inducement at worst."

¶ 28    The obligors filed a motion to strike the bank's second summary judgment motion.  They contended that the motion merely restated the bank's contentions from its earlier summary judgment motion, which had been rejected previously by the circuit court.  In an order entered on November 16, 2020, the circuit court denied the summary judgment motion "on the grounds that the issues raised in the Motion were previously argued and decided by the Court's order of September 19, 2019[,] denying the parties' cross motions for summary judgment."

¶ 29                                 *Discovery Motions*

¶ 30     The obligors then filed a motion to limit additional discovery, which the circuit court granted.  In an order entered on October 20, 2021, the circuit court limited the remaining discovery to "the issue of the damages, if any, sustained by [the bank] for the period of January 1, 2019 to July 1, 2019 as a result of Defendant, Rahman's, non-payment default for failure to pledge the required collateral as required under the Forbearance Agreement or the breach of the Forbearance Agreement by Defendant, Engstrom."

¶ 31     The bank subsequently filed a motion to compel pursuant to Illinois Supreme Court Rule 219 (eff. July 1, 2002).  The bank alleged that during the depositions of two of the bank's executives in January 2022, the obligors asked a wide array of questions regarding (a) the loan documentation, (b) the negotiation of the forbearance agreement and its terms, (c) communications between bank representatives and the obligors, and (d) the witnesses' understanding of various provisions of the forbearance agreement, including the pledge of stock as collateral.  Conversely, in early February 2022, when the bank commenced the deposition of Engstrom, her counsel objected and instructed her not to answer most of the questions regarding the foregoing topics.  As counsel stated he would object to any similar questions asked of Rahman during his deposition scheduled for later that day, the bank decided to adjourn the depositions and submit the motion to compel.

¶ 32     The circuit court denied the motion and ordered that the obligors be "re-depose[d]." The circuit court directed that each deposition would not exceed one hour and would be limited to the scope set forth in the order entered on October 20, 2021.

¶ 33                          *Obligors' Renewed Motion for Summary Judgment*

¶ 34     The obligors filed a renewed motion for summary judgment, arguing that their breach of

the nonmonetary terms – *e.g.*, by failing to effectuate the stock pledges – did not result in any damages to the bank, as such pledges were intended to secure the 2019 payment, which was timely made. The obligors maintained that the bank was unable to demonstrate that it suffered any damages during the forbearance period due to Rahman's failure to make the stock pledges.

¶ 35 In an order entered on June 30, 2022, the circuit court granted the renewed motion for summary judgment. Noting its prior ruling that the breach was *de minimis* unless the bank "could show some harm from the breach of the non-monetary failure to pledge collateral," the circuit court found that neither the depositions of the bank's executives nor the other discovery responses from the bank articulated any such damages. The circuit court further observed that the bank did not file a response to the renewed motion.

¶ 36 The bank timely filed the instant appeal. The notice of appeal specifically referenced multiple orders in this matter, including the June 30, 2022, order granting summary judgment in favor of the obligors and the September 19, 2019, order denying the bank's motion for summary judgment.

¶ 37                                        ANALYSIS

¶ 38 The bank contends on appeal that its damages consist of the outstanding liabilities under the loan documentation. According to the bank, the circuit court mistakenly viewed the forbearance agreement as "untethered" from the loan documentation, such that the liabilities no longer existed. The obligors primarily assert that the bank is not entitled to collect payment for the underlying indebtedness as damages for the breach of the forbearance agreement. Prior to analyzing these arguments, we must address certain preliminary issues raised by the obligors.

¶ 39                                   *Preliminary Issues*

¶ 40 According to the obligors, the bank waived the right to challenge the grant of summary

judgment in favor of the obligors by failing to file a response to their motion. Simply put, we reject this contention. The bank repeatedly argued in the circuit court that the obligors' violations of the forbearance agreement caused the full outstanding debt under the loan documentation to become due and owing. Based on the court's prior rulings rejecting this position and substantially narrowing the damages issue, it is understandable that the bank did not respond to the obligors' second summary judgment motion. *E.g.*, *Champaign-Urbana Public Health District v. Illinois Human Rights Comm'n*, 2022 IL App (4th) 200357, ¶ 166 (noting that "[b]ecause the issues raised at summary judgment are purely legal and are fully considered by the trial court, nothing about the damages proceedings affects the court's prior analysis on liability"). See also *Cleveland Wrecking Co. v. Central National Bank of Chicago*, 216 Ill. App. 3d 279, 285 (1991) (providing that a party's claim that the opposing party "waived its objection to the denial of its motion to strike by failing to renew such objection following the amended complaint is not supported by the case law"). Furthermore, parties are not required to appeal an interlocutory order within 30 days of that order but may instead choose to appeal upon a final judgment in the case, as the bank did herein. See *Glover v. Fitch*, 2015 IL App (1st) 130827, ¶ 2. To the extent that the bank is challenging the order entered on September 19, 2019, denying its motion for summary judgment, the law is settled that an appeal from a final judgment permits the review of all preceding nonfinal orders that produced the judgment. *Id.* ¶ 22.

¶ 41   The obligors also contend that the bank improperly raised new arguments on appeal which were never raised in the circuit court. As the obligors accurately observe, a reviewing court will not consider arguments that were not presented to the circuit court. See *Reynolds v. Village of Creve Coeur*, 2022 IL App (3d) 210260, ¶ 22; *Seifert v. Sneckenberg Thompson & Brody, LLP*, 2022 IL App (1st) 200966, ¶ 43. We reject, however, the obligors'

11

characterizations of the challenged arguments. For example, the obligors assert that the bank argues for the first time on appeal that the trial court erred by treating the forbearance agreement as a "novation," *i.e.*, a "type of substituted contract in which a new obligation or a new party is substituted for an existing one." *Crest Hill Land Development, LLC v. Conrad*, 2019 IL App (3d) 180213, ¶ 35. The bank did not know, however, that the circuit court would effectively view the forbearance agreement as a new debt until the court issued its ruling. In any event, the bank has consistently maintained that the forbearance agreement did not eliminate the indebtedness under the loan documentation.

¶ 42                                  *Summary Judgment Standards*

¶ 43     The bank asserts that the circuit court erred in denying its original motion for summary judgment and by ultimately granting summary judgment in favor of the obligors. Summary judgment is proper "if the pleadings, depositions, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." 735 ILCS 5/2-1005(c) (West 2020). The purpose of summary judgment is not to try an issue of fact but to determine whether one exists. *Monson v. City of Danville*, 2018 IL 122486, ¶ 12. Although summary judgment has been characterized as a "drastic measure," it is an appropriate tool to employ in the expeditious disposition of a lawsuit when the rights of the movant are clear and free from doubt. *Aalbers v. LaSalle Hotel Properties*, 2022 IL App (1st) 210494, ¶ 15. Unsupported conclusions, speculation, or opinions are insufficient to raise a genuine issue of material fact. *Valfer v. Evanston Northwestern Healthcare*, 2016 IL 119220, ¶ 20.

¶ 44     We review a circuit court's summary judgment ruling *de novo*. *Monson*, 2018 IL 122486, ¶ 12. See also *Gallagher v. Lenart*, 226 Ill. 2d 208, 219 (2007) (providing that the

construction of a contract presents a question of law requiring *de novo* review).

¶ 45                                    *The Forbearance Agreement*

¶ 46     The crux of this litigation is that the parties fundamentally disagree in their interpretations of the forbearance agreement.  The bank contends that the intent of the agreement was for the bank to forbear from exercising its rights under the loan documentation – including its right to recover the entire amount due – *only* as long as the obligors complied with its terms. The obligors have argued that the bank is attempting to use their breach of the nonmonetary provisions for an improper purpose, *i.e.*, to obtain a "monetary windfall" of substantially more than the amount to which it was allegedly entitled under the forbearance agreement.

¶ 47     The basic rules governing contract interpretation are well settled.  *Thompson v. Gordon*, 241 Ill. 2d 428, 441 (2011).  The primary objective in construing a contract is to give effect to the parties' intent.  *Gallagher*, 226 Ill. 2d at 232.  "A court must initially look to the language of the contract alone, as the language, given its plain and ordinary meaning, is the best indication of the parties' intent."  *Id.* at 233.  "Moreover, because words derive their meaning from the context in which they are used, a contract must be construed as a whole, viewing each part in light of the others."  *Id.*  See also *Thompson*, 241 Ill. 2d at 441 (noting that the intent of the parties is not determined by viewing a provision or clause in isolation, or in examining detached portions of the contract).  When the language of a contract is clear and unambiguous, it must be given its plain, ordinary, and popular meaning.  *Ritacca Laser Center v. Brydges*, 2018 IL App (2d) 160989, ¶ 15.  If, however, the contractual language is susceptible to more than one meaning, it is ambiguous, and a court may consider extrinsic evidence to determine the intent of the parties. *Thompson*, 241 Ill. 2d at 441.

¶ 48     Based on our review of the forbearance agreement, the intent of the parties was clear.

The parties expressly agreed that the obligors "are and continue to be in default" under the loan documentation. The forbearance agreement provided that the obligors "desire [the bank] to forbear from exercising certain of its rights and remedies" arising from the existing defaults and that the bank was "willing to provide such forbearance, but solely on the terms and subject to the conditions contained in this Agreement." The agreement further provided that the bank would forbear from exercising its rights and remedies arising from the existing defaults provided that the obligors "fully and timely comply with, satisfy and perform each of the conditions, covenants, terms and provisions set forth in this Agreement." In the event of a "breach, default or noncompliance" with the terms of the forbearance agreement by the obligors, the bank's agreement to "temporarily forbear shall terminate automatically, without the requirement of any demand, presentment, protest, notice, or further act or action" by the bank. The obligors agreed and acknowledged that the effect of such termination would permit the bank to demand that the liabilities under the loan agreement become due and payable immediately and to exercise any rights and remedies available under the loan documentation.

¶ 49    As reflected in the foregoing excerpts, the plain language of the forbearance agreement required strict adherence to its terms; failure to strictly comply would result in the immediate termination of the bank's forbearance. If the parties had wished to impose a materiality requirement with respect to any breach or default of the forbearance agreement, they could have so provided – but they did not. *Ritacca Laser Center*, 2018 IL App (2d) 160989, ¶ 21; *Berryman Transfer & Storage Co. v. New Prime, Inc.*, 345 Ill. App. 3d 859, 863 (2004). See also *Joyce v. Fidelity Real Estate Growth Fund II, L.P.*, 2013 IL App (1st) 121697, ¶ 35 (noting that the forbearance agreement permitted the lender to seek remedies upon any further event of default, regardless of whether it was deemed "material"); *Easterday Dairy, LLC v. Fall Line Capital,*

*LLC*, No. 2:22-CV-01000-HL, 2022 WL 17104572 (D. Or. Nov. 22, 2022) (rejecting the debtors' argument that only a material breach could justify termination).

¶ 50    The obligors maintain that the bank was not damaged by their failure to pledge stock as required by the forbearance agreement. We disagree. Although the obligors contend that the stock pledges were intended to serve as collateral solely for the $300,000 obligation, the forbearance agreement was clearly intended, in part, to strengthen the bank's credit position generally. Among other things, the obligation to pledge the stock was "in consideration of the diminution of value" of the AliphCom collateral. See *Gallagher*, 226 Ill. 2d at 233 (noting that the language of the contract is the best indication of the parties' intent). Even assuming *arguendo* that the stock pledges were intended to exclusively secure the $300,000 amount – which was ultimately paid – the obligors' failure to effectuate such pledges in accordance with the parties' agreement directly led to the initiation of litigation and the resultant expense.

¶ 51    More significantly, the obligors' position effectively ignores express language in the forbearance agreement, *i.e.*, the parties' acknowledgment that there were multiple existing defaults under the loan documentation. When the forbearance agreement was executed, the bank had already incurred damages due to the obligors' conduct, and the obligors expressly agreed that they owed the amounts set forth in the agreement. At the obligors' request, the bank agreed to forbear from exercising its rights – and agreed to accept a reduced payment – only if the obligors fully complied with the negotiated terms, which the obligors failed to do. If we adopted the obligors' reasoning, the bank effectively placed itself in a worse position by entering into the forbearance agreement than if it had simply pursued the entire indebtedness without extending any leniency to the obligors. "When construing a commercial contract, common sense is as much a part of contract interpretation as is the dictionary or the arsenal of canons." (Internal

citations omitted.) *Joyce*, 2013 IL App (1st) 121697, ¶ 23 (applying Massachusetts law).

¶ 52    For the reasons discussed above, we find that the bank was damaged by the obligors' failure to fully and timely comply with the forbearance agreement, which was inextricably linked to the loan documentation and the indebtedness thereunder. We thus conclude that the circuit court erred in initially denying the bank's motion for summary judgment as to Rahman and in subsequently granting summary judgment in favor of Rahman. We remand this matter to the circuit court to enter judgment in favor of the bank and against Rahman in the amount of the outstanding liabilities under the loan documentation – including interest, attorney fees and any other applicable charges – minus the proceeds from the sale of the San Francisco property and the $300,000 payment.

¶ 53    As to Engstrom, however, we affirm the grant of summary judgment in her favor. Although she was a signatory to the forbearance agreement, she was not a borrower under the loan documentation. In its complaint, the bank solely sought the $300,000 amount (plus attorney fees and interest) from Engstrom, which amount was ultimately paid; the bank did not seek the full outstanding indebtedness under the loan documentation from Engstrom. Moreover, in its second motion for summary judgment, the bank pursued count I of the complaint, which was directed against Rahman, and not count II, which was directed against Engstrom. Based on the foregoing, we affirm the grant of summary judgment in favor of Engstrom.

¶ 54                                    CONCLUSION

¶ 55    We reverse the grant of summary judgment in favor of Rahman and remand to the circuit court to enter judgment in favor of the bank and against Rahman, as described herein. We affirm the grant of summary judgment in favor of Engstrom.

¶ 56    Reversed in part; affirmed in part; remanded with instructions.